# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1578

_____

Gregory Wersal,

            Appellant,

    v.

Patrick D. Sexton, in his official
capacity as Chair of the Minnesota
Board of Judicial Standards; William J.
Egan, in his official capacity as a
Member of the Minnesota Board of
Judicial Standards; Douglas A. Fuller,
in his official capacity as a Member of
the Minnesota Board of Judicial
Standards; Jon M. Hopeman, in his
official capacity as a Member of the
Minnesota Board of Judicial Standards;
Cynthia Jepsen, in her official capacity
as a Member of the Minnesota Board of
Judicial Standards; E. Anne McKinsey,
in her official capacity as a Member of
the Minnesota Board of Judicial
Standards; Gary Pagliaccetti, in his
official capacity as a Member of the
Minnesota Board of Judicial Standards;
James Dehn, in his official capacity as a
Member of the Minnesota Board of
Judicial Standards; Kent A Gernarder,
in his official capacity as Chair of the
Minnesota Lawyers Professional
Responsibility Board; Vincent A.
Thomas, in his official capacity as Vice

Appeal from the United States
District Court for the District of
Minnesota.

Chair of the Minnesota Lawyers     *
Professional Responsibility Board;     *
Kathleen Clarke Anderson, in her     *
official capacity as a Member of the     *
Minnesota Lawyers Professional     *
Responsibility Board; Mark R. Anway,     *
in his official capacity as a Member of     *
the Minnesota Lawyers Professional     *
Responsibility Board; Robert B. Bauer,     *
in his official capacity as a Member of     *
the Minnesota Lawyers Professional     *
Responsibility Board; Joseph V.     *
Ferguson, III, in his official capacity as     *
a Member of the Minnesota Lawyers     *
Professional Responsibility Board;     *
Wood R. Foster, Jr., in his official     *
capacity as a Member of the Minnesota     *
Lawyers Professional Responsibility     *
Board; Susan C. Goldstein, in her     *
official capacity as a Member of the     *
Minnesota Lawyers Professional     *
Responsibility Board; Sherri D.     *
Hawley, in her official capacity as a     *
Member of the Minnesota Lawyers     *
Professional Responsibility Board;     *
Lynn J. Hummel, in her official     *
capacity as a Member of the Minnesota     *
Lawyers Professional Responsibility     *
Board; Geri L. Krueger, in her official     *
capacity as a Member of the Minnesota     *
Lawyers Professional Responsibility     *
Board; Ann E. Mass, in her official     *
capacity as a Member of the Minnesota     *
Lawyers Professional Responsibility     *
Board; Mary L. Medved, in her official     *
capacity as a Member of the Minnesota     *
Lawyers Professional Responsibility     *

Board; David A. Sasseville, in his *
official capacity as a Member of the *
Minnesota Lawyers Professional *
Responsibility Board; Debbie *
Toberman, in her official capacity as a *
Member of the Minnesota Lawyers *
Professional Responsibility Board; *
Dianne A. Ward, in her official capacity *
as a Member of the Minnesota Lawyers *
Professional Responsibility Board; *
Stuart T. Williams, in his official *
capacity as a Member of the Minnesota *
Lawyers Professional Responsibility *
Board; Jan M. Zender, in her official *
capacity as a Member of the Minnesota *
Lawyers Professional Responsibility *
Board; William P. Donohue, in his *
official capacity as a Member of the *
Minnesota Lawyers Professional *
Responsibility Board; Marne Gibbs *
Hicke, in her official capacity as a *
Member of the Minnesota Lawyers *
Professional Responsibility Board; *
Richard H. Kyle, Jr., in his official *
capacity as a Member of the Minnesota *
Lawyers Professional Responsibility *
Board; Michael W. Unger, in his *
official capacity as a Member of the *
Minnesota Lawyers Professional *
Responsibility Board; Daniel R. *
Wexler, in his official capacity as a *
Member of the Minnesota Lawyers *
Professional Responsibility Board; *
Randy R. Staver, in his official capacity *
as a Member of the Minnesota Board *
of Judicial Standards; Honorable Terri *
Stoneburner, in her official capacity as *

a Member of the Minnesota Board of        *
Judicial Standards,                       *
                                          *
            Appellees.                    *

_____

Submitted: December 16, 2009
Filed: July 29, 2010 (corrected 8/9/10)

_____

Before BYE, BEAM, and COLLOTON, Circuit Judges.

_____

BEAM, Circuit Judge.

This case presents the question of whether three provisions of the Minnesota Code of Judicial Conduct (Code) unconstitutionally infringe upon First Amendment rights of judicial candidates. Gregory Wersal, a candidate for Justice of the Minnesota Supreme Court, asserts that the so called "endorsement," "personal solicitation," and "solicitation for a political organization or candidate" clauses of Canon 4[1] are unconstitutional on their face or as applied to him. On cross-motions for summary judgment, the district court rejected Wersal's First Amendment claims and granted summary judgment to the appellees–members of the Minnesota Board of Judicial Standards and the Minnesota Lawyers Professional Responsibility Board. Wersal appeals, and we reverse.

_____

[1]When Wersal initiated this lawsuit, these clauses were set forth in Canon 5. Prior to this appeal, however, the Minnesota Supreme Court revised the Code. See Order Promulgating Revised Minn. Code of Judicial Conduct, No. ADM08-8004 (Minn. Dec. 18, 2008) (effective July 1, 2009), available at http://www.bjs.state.mn.us. As a result of those revisions, the challenged clauses are now located in Canon 4.

## I.    BACKGROUND

This case has its roots in Republican Party of Minnesota v. White, 536 U.S. 765 (2002) (White I), and this court's prior en banc decision, Republican Party of Minnesota v. White, 416 F.3d 738 (8th Cir. 2005) (en banc) (White II).  In those opinions, Wersal, among others, successfully challenged the so called "announce," "partisan-activities," and "solicitation" clauses of Canon 5 on First Amendment grounds.  White I, 536 U.S. at 788 (announce clause); White II, 416 F.3d at 766 (partisan-activities and solicitation clauses).  In an effort to bring the Code into compliance with the White decisions, the Minnesota Supreme Court removed the "announce" and "partisan-activities" clauses from the Code and amended the "solicitation clause."  Wersal now maintains that the amendments to the solicitation clause do not cure its invasion of his First Amendment rights, and that the endorsement clause improperly restricts expression protected by the First Amendment.

The endorsement clause–Canon 4.1(A)(3)–and the solicitation clauses–Canon 4.1(A)(4) and (6)–each rein in a judicial candidate's[2] speech.[3] The endorsement clause prevents a judicial candidate from  "publicly endors[ing] or, except for the judge or candidate's opponent, publicly oppos[ing] another candidate for public office." 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(3).  The personal solicitation clause prohibits a judicial candidate from "personally solicit[ing] or accept[ing] campaign contributions," id. at 4.1(A)(6), and the solicitation for a political organization or candidate clause provides that a judicial candidate shall not

---

[2]The Code defines "judicial candidate" as "any person, including a sitting judge, who is seeking selection for judicial office by election or appointment."  52 Minn. Stat. Ann., Code of Judicial Conduct, Terminology.

[3]Notably, Canon 4 applies to both judicial candidates and to non-candidate judges.  See 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1.  We review the constitutionality of these clauses only as they apply to judicial candidates.

"solicit funds for a political organization or a candidate for public office," id. at 4.1(A)(4)(a).[4]

The facts of this case indicate the degree to which these particular provisions have chilled Wersal's speech. In early 2007, Wersal announced his intention to run for the office of Chief Justice of the Minnesota Supreme Court. As part of his campaign, Wersal wanted to publicly endorse certain other candidates for public office. Specifically, he desired to support Tim Tinglested, candidate for Associate Justice of the Minnesota Supreme Court, Glen Jacobsen, candidate for Minnesota District Court Judge, and Michele Bachmann, candidate for United States Congress. However, the endorsement clause prevented Wersal from engaging in any such public endorsement of these candidates.

Moreover, Wersal wanted to personally solicit funds for his 2008 campaign from non-attorneys by going door-to-door and by making personal phone calls asking for financial support although he pledged (and continues to pledge) to recuse himself from any case in which a known contributor is or becomes a party. However, the personal solicitation clause specifically barred him from engaging in such activity, and Wersal felt that the solicitation for a political organization or candidate clause further constrained his efforts in seeking financial contributions from non-attorneys. Accordingly, Wersal believed that he could not wage an effective campaign as long as the endorsement and solicitation clauses remained in force. He, therefore, asked for injunctive and declaratory relief in the district court. After it became apparent that Wersal would not be able to get adequate relief prior to the 2008 campaign, he decided not to run for the Minnesota Supreme Court in 2008, but to instead run for the

_____

[4]These clauses are subject to certain other requirements and exceptions listed in Canons 4.2 and 4.4 of the Code. 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.2(A)(5), B(3) & 4.4(B)(1). We deal with these additional requirements and exceptions in more detail below.

Minnesota Supreme Court during the 2010 elections.[5]  In furtherance of his 2010 campaign, Wersal wishes to engage in conduct parallel to that which he sought to engage during the 2008 campaign.  However, just as in 2008, Wersal continues to feel limited by the contested clauses.

In granting the appellees' motion for summary judgment, the district court held (1) Wersal's challenge to the solicitation for political organization or candidate clause was not ripe; and (2) the endorsement and personal solicitation clauses were narrowly tailored to meet the state's legitimate interest in protecting judicial impartiality.

## II.    DISCUSSION

### A.    Judicial Selection and Political Speech

Minnesota chooses to elect the judges of its courts.  Minn. Const. art. 6, § 7. While we have confessed "some bias in favor of a system for the appointment of judges," the sovereignty of the states within our federal system guarantees that "Minnesota may choose (and has repeatedly chosen) to elect its appellate judges." White II, 416 F.3d at 746, 747.  But "[i]f Minnesota sees fit to elect its judges, which it does, it must do so using a process that passes constitutional muster."  Id. at 748.

Minnesota has enacted Canon 4 of the Code in an effort to regulate judicial elections.  In White I, the Supreme Court held the announce clause, which prohibited judicial candidates from stating their views on disputed legal issues, unconstitutional. In White II, an en banc court of this circuit held the partisan-activities and solicitation

---

[5]According to the Minnesota Secretary of State, Wersal has now filed to run in 2010 against Associate Justice Helen Meyer for the position she now occupies on the Minnesota Supreme Court.  Minnesota Secretary of State, Candidate Filings, http://candidates.sos.state.mn.us/ (follow "Judicial Offices" hyperlink) (last visited June 23, 2010).

clauses unconstitutional. It now falls to this panel to determine whether the endorsement, personal solicitation, and solicitation for a political organization or candidate clauses are permissible under the First Amendment.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Inherent within this protection is the "corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984); see also Buckley v. Valeo, 424 U.S. 1, 15 (1976) ("The First Amendment protects political association as well as political expression."). And, the First Amendment is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 336 n.1 (1995).

The political speech burdened by the clauses at issue in this case is "the very stuff of the First Amendment." White II, 416 F.3d at 748. Indeed, "'the constitutional guarantee [of the freedom of speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" Id. (alteration in original) (quoting Buckley, 424 U.S. at 15). Our system of representative democracy relies on such a protection of political speech, "for it is the means to hold officials accountable to the people." Citizens United v. FEC, 130 S. Ct. 876, 898 (2010); see also Buckley, 424 U.S. at 14-15 ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation."). "For these reasons, political speech must prevail against laws that would suppress it, whether by design or inadvertence." Citizens United, 130 S. Ct. at 898.

Indeed, so strong is the protection of political speech that the Court recently indicated that "it might be maintained that political speech simply cannot be banned or restricted as a categorical matter." Id. However, the Court stopped short of

placing a categorical ban on political speech restrictions, choosing instead to examine laws burdening political speech under "strict scrutiny." Id. Thus, we only permit restraint of political speech where, upon strict scrutiny, the regulation "advances a compelling state interest and is narrowly tailored to serve that interest." White II, 416 F.3d at 749.

Canon 4's restrictions on endorsements of candidates and solicitation of campaign funds directly limit judicial candidates' political speech. And, Canon 4's restriction on whom a candidate may endorse limits a candidate's right to associate with others who share common political beliefs and aims. Thus, Minnesota's endorsement and solicitation clauses burden political speech and must be examined under strict scrutiny.

## B.    Canon 4.1(A)(4)(a)'s Ripeness

Before we apply strict scrutiny to the clauses, we must first ask whether Wersal's challenge to the political organization or candidate solicitation clause–Canon 4.1(A)(4)(a)–is ripe for review. This clause provides that a judicial candidate shall not "solicit funds for a political organization or a candidate for public office."[6]  52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(4)(a). The district court held that Wersal's challenge to this restriction was not ripe because the intent of this rule was to restrict candidate's from soliciting funds for political parties and other candidates. Specifically, the court held that the issue was not ripe because (1) the clause had never been applied to a candidate's solicitations for his or her own campaign; (2) Wersal's campaign committee was not a "political organization" as defined by the Code; (3) Wersal had not sought an advisory opinion as to whether the clause would apply to

---

[6]Canon 4.1(A)(4)(b) also prohibits a judicial candidate from making "a contribution to a candidate for public office." Wersal has not challenged the application of the "contribution clause," and we refrain from reviewing it.

-9-

solicitations for his campaign; and (4) Wersal's interpretation was an absurd reading of the Code which was contrary to its plain meaning. We disagree.

The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbot Labs. v. Gardner, 387 U.S. 136, 148 (1967), rev'd on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977). Before the federal courts may address a question, "there must exist 'a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" Neb. Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1037-38 (8th Cir. 2000) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)). Accordingly, to determine whether a dispute is ripe for judicial review we consider "(1) the hardship to the plaintiff caused by delayed review; (2) the extent to which judicial intervention would interfere with administrative action; and (3) whether the court would benefit from further factual development." Nat'l Right to Life Political Action Comm. v. Connor, 323 F.3d 684, 692-93 (8th Cir. 2003) (citing Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998)).

The district court's ripeness analysis is flawed in four ways. First, the fact that the clause has never been applied to prohibit a candidate from soliciting contributions for his or her own campaign does not dispositively indicate that the provision would never be so applied. Second, although Wersal's own campaign committee is not a "political organization" under the Code,[7] the clause also prohibits a candidate from soliciting "funds for . . . a *candidate* for public office," which includes Wersal himself in this instance. 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(4)(a)

---

[7]"For purposes of this Code, the term [political organization] does not include a judicial candidate's campaign committee . . . ." 52 Minn. Stat. Ann., Code of Judicial Conduct, Terminology, "Political Organization."

(emphasis added).[8]  And, as we noted in White II, clauses which restrict a candidate from soliciting funds for his own campaign are content-based restrictions which burden core political speech.  416 F.3d at 763-64.  Accordingly, a plain reading of this clause chills Wersal from engaging in speech–solicitation of funds–which this court has already held is protected First Amendment expression.

Third, we do not rigidly require that the plaintiff seek a pre-enforcement advisory opinion where, as here, the regulation at issue chills protected First Amendment activity.  See Minn. Citizens Concerned for Life v. FEC, 113 F.3d 129, 132 (8th Cir. 1997); see also Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 393 (1988) (noting "self-censorship [is] a harm that can be realized without an actual prosecution");  Majors v. Abell, 317 F.3d 719, 721 (7th Cir. 2003) (stating that "[a] plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute" (citations omitted)).  Moreover, the appellees could very easily have drafted an advisory opinion in response to this litigation indicating that the clause would not be applied to a candidate's solicitation of funds for his own campaign.  That the appellees did not to do so indicates that the clause more than likely does apply to Wersal's desires to solicit funds for his own campaign.

Fourth, our reading of this clause is neither absurd nor contrary to any other provision in the Code.  Although the clause may have been intended to prevent a judicial candidate from soliciting funds for *another* candidate's campaign, neither the clause itself nor the Canon as a whole compels such a reading.  We note that under our

---

[8]Giving the term "candidate," its ordinary or natural meaning, see Crawford v. Metropolitan Government of Nashville and Davidson County, 129 S. Ct. 846, 850 (2009), means "a person who seeks an office." Random House Webster's Unabridged Dictionary 304 (2d ed. 1997).  Since Wersal is seeking an elected office, he is a "candidate."  Accordingly, under a plain reading of the clause, it prohibits Wersal from soliciting funds for his own candidacy.

reading, this clause is similar to, if not redundant with, the personal solicitation clause. But, the mere fact that a Code is redundant is not evidence of its absurdity. Morever, we decline to impart a different meaning to language that plainly prevents the soliciting of funds for one's own campaign.

Where a regulation, such as Canon 4.1(A)(4)(a), chills protected First Amendment activity, its hardship upon the plaintiff is sufficiently substantial to justify a pre-enforcement declaratory judgment action. Minn. Citizens, 113 F.3d at 132. Morever, we generally consider an issue to be fit for judicial decision when the issue involved is legal rather than factual. See id. Here, the issue presented requires no further factual development, is largely a legal question, and chills protected First Amendment expression. Thus, to the extent that the solicitation for a political organization or candidate clause prevents Wersal from soliciting funds for his own campaign, there exists a real, substantial and concrete dispute, and the issue is ripe for review.

## C.     Constitutional Framework

Having found that Wersal's challenge to the solicitation for a political organization or candidate clause is ripe, we now turn to the constitutional issues before us.

### 1.     Facial vs. As-Applied Challenges

Wersal encourages us to examine the facial constitutionality of these clauses. Alternatively, Wersal asserts that the clauses are at least unconstitutional as-applied. Therefore, we begin our constitutional analysis by determining whether we will examine these challenges as an as-applied challenge or as a facial challenge.

The Supreme Court cautions against holding a law facially unconstitutional and encourages us to exercise "judicial restraint in a facial challenge." Wash. State

Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008). Indeed, "a plaintiff can [generally] only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the [law] would be valid.'" Id. at 449 (second alteration in original) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). Accordingly, "a facial challenge must fail where the [law] has a plainly legitimate sweep." Id. (internal quotation omitted).

However, in the realm of regulations that chill speech, the Court has relaxed this standard, recently noting that "a [regulation] which chills [protected] speech can and must be invalidated where its facial invalidity has been demonstrated." Citizens United, 130 S. Ct. at 896. Moreover, "the validity of [a] regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case." United States v. Edge Broad. Co., 509 U.S. 418, 430 (1993) (quotation omitted).

The endorsement clause chills speech "that is beyond all doubt protected[,] mak[ing] it necessary in this case to" review the facial validity of that regulation. Citizens United, 130 S. Ct. at 896. As to the solicitation clauses, Wersal's averments are very limited. He asserts only that his efforts to personally solicit funds for his own campaign from non-attorneys are thwarted by the clauses, Compl. ¶¶ 22, 44; Appellant's Br. 15, 55, apparently recognizing that solicitation from attorneys may well raise different issues, particularly in view of the "very specific information about campaign contributions . . . publicly available, notably on the Internet." White II, 416 F.3d at 765 n.16; see also Siefert v. Alexander, No. 09-1713, 2010 WL 2346659, at *14 (7th Cir. Jun. 14, 2010) (noting that recusal from all cases involving a broad range of attorneys from whom the candidate solicited contributions could present serious practical problems for the state judiciary). Accordingly, we review the constitutionality of the solicitation clauses only as-applied to Wersal's desire to solicit from non-attorneys for his own campaign.

## 2.     Strict Scrutiny

Any regulation which curtails political speech violates the Constitution unless it can withstand strict scrutiny review.  White II, 416 F.3d at 749.  To survive strict scrutiny, the state must "show that the law that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest."  Id.  This examination "is best described as an end-and-means test that asks whether the state's purported interest is important enough to justify the restriction it has placed on the speech in question in pursuit of that interest."  Id. at 750.

To determine whether an interest (the end) is "important enough" to justify the abridgement of core constitutional rights, we examine the regulation (the means) purportedly addressing that end.  Id.

> A clear indicator of the degree to which an interest is "compelling" is the tightness of the fit between the regulation and the purported interest: where the regulation fails to address significant influences that impact the purported interest, it usually flushes out the fact that the interest does not rise to the level of being "compelling."

Id.  If the interest is sufficiently compelling, then we ask whether the regulation (the means) used to meet that end is "narrowly tailored to serve that interest."  Id. at 751.  Determining whether a regulation is narrowly tailored requires an examination of several related factors.  As we stated in White II,

> A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).

-14-

Id. In other words, a regulation which burdens political speech will only withstand constitutional scrutiny if it is "as *precisely* tailored as possible" to meet a very important end. Id.

### D. Minnesota's Purported Compelling State Interest: Impartiality

Minnesota maintains that its interests in maintaining judicial impartiality and the appearance thereof are compelling interests worthy of supporting its regulation of judicial candidates' speech.[9] In White I, the Supreme Court defined the bounds of Minnesota's interest in judicial impartiality, providing that impartiality in the judicial context had three potential meanings.

One such meaning of "impartiality" is a "lack of preconception in favor of or against a particular *legal view*." White I, 536 U.S. at 777. According to the Court, Minnesota does not have a compelling interest in seeking judges who "lack . . . predisposition regarding the relevant legal issues in a case." Id. This is because "[p]roof that a Justice's mind at the time he joined the Court was a complete *tabula rasa* in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias." Id. at 778 (quotation omitted). Thus, Minnesota has no compelling interest in preventing judicial preconceptions on legal issues. Id.

A second meaning of "impartiality" is "lack of bias for or against either *party* to [a] proceeding." Id. at 775. This notion "assures equal application of the law" because it "guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party." Id. at 776. The Supreme Court implied, and we have expressly held "that *this* meaning of impartiality describes a

---

[9]As Justice O'Connor aptly notes, "If the State has a problem with judicial impartiality [or its appearance], it is largely one the State brought upon itself by continuing the practice of popularly electing judges." White I, 536 U.S. at 792 (O'Connor, J., concurring).

state interest that is compelling." White II, 416 F.3d at 753. Because protecting litigants from biased judges presents a compelling state interest, the only question remaining is whether each or any of the challenged clauses is narrowly tailored to meet this compelling interest. We address this question in Part E below.

The third meaning of "impartiality" is "described as openmindedness," meaning "not that [the judge has] no preconceptions on legal issues, but that he be willing to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case." White I, 536 U.S. at 778. In other words, it is impartiality that "seeks to guarantee each litigant, not an *equal* chance to win the legal points in the case, but at least *some* chance of doing so." Id. The Court refrained from determining whether impartiality articulated as "openmindedness" constitutes a compelling state interest, finding instead that even if it were a compelling interest, the announce clause was "woefully underinclusive" to meet such an interest. Id. at 780. In White II, we determined that the clauses at issue were similarly "woefully underinclusive" to serve an interest in openmindedness. 416 F.3d at 758, 766.[10] Likewise, the underinclusiveness of Canon 4's endorsement and solicitation clauses illustrates that they are, as well, woefully underinclusive in serving any such interest, whether it is compelling or not. We address this underinclusiveness below.

---

[10]In White II, we noted that "the underinclusiveness of Canon 5's partisan activities clause clearly establishe[d]" that judicial openmindedness was not "sufficiently compelling to abridge core First Amendment rights." 416 F.3d at 759. Specifically, we held that "the partisan-activities clause [left] appreciable damage to the supposedly vital interest of judicial openmindedness unprohibited, and thus Minnesota's argument that it protects an interest of the highest order fails." Id. at 760. While the same may be said of the clauses at issue in this case, we pass on the question of whether openmindedness constitutes a compelling interest, focusing our analysis instead on the narrow tailoring of the clauses.

**E.      Narrow Tailoring**

Although Minnesota has a compelling interest in promoting impartiality defined as a lack of bias against parties and possibly has a compelling interest in promoting impartiality defined as openmindedness, the constitutionality of the challenged regulations turns on whether the regulations are narrowly tailored to meet either of these interests.  As noted above, a regulation is narrowly tailored only where it is necessary, not overinclusive, not underinclusive, and is the least restrictive alternative to address the purported state interest.  Id. at 751.  Each of the three clauses must independently meet this analysis.  We hold that all three fail.

**1.      The Endorsement Clause**

The endorsement clause of Canon 4.1(A)(3) prohibits a judicial candidate from "publicly endors[ing] or, except for the judge or candidate's opponent, publicly oppos[ing] another candidate for public office." 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(3).[11]  This restriction depends wholly upon the subject matter of the speech for its invocation.  Candidates are not barred from talking about other candidates for any purpose other than endorsing or opposing them.  "Restricting speech based on its subject matter triggers the same strict scrutiny as does restricting core political speech."  White II, 416 F.3d at 763-64.  This is because "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." Carey v. Brown, 447 U.S. 455, 462 n.6 (1980) (quotation omitted).

---

[11] Wersal only challenges the "endorsement" provision of the clause.

Additionally, the endorsement clause burdens core political speech.[12] As we noted in White II

"[A] candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates. Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known [and associate with like-minded persons] so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day. Mr. Justice Brandeis' observation that in our country public discussion is a political duty, applies with special force to candidates for public office. . . . [T]he First Amendment simply cannot tolerate [a] restriction upon the freedom of a candidate to speak [or associate] without legislative limit on behalf of his own candidacy."

416 F.3d at 757 n.8 (alterations in original) (quoting Buckley, 424 U.S. at 52-54). Thus, the endorsement clause burdens political expression because it impairs a candidate's ability to vigorously advocate the election of other candidates, associate with like-minded candidates, and, thus, vigorously advocate his or her own campaign. Such a burden on core political speech triggers strict scrutiny. Citizens United, 130 S. Ct. at 898; see also White II, 416 F.3d at 748-49. Accordingly, the endorsement clause, which is a content-based restriction on core political speech, is subject to strict scrutiny review.

---

[12]Appellees argue that endorsements are not necessary to run an effective campaign. Such an inquiry, however, is irrelevant as to whether restricting endorsements burdens core political speech. Instead, the inquiry is whether the infringed expression would communicate *relevant* information to the electorate. See White I, 536 U.S. at 782 ("We have never allowed the government to prohibit candidates from communicating relevant information to voters during an election.").

-18-

### a. Unbiased Judges

The appellees contend that the endorsement clause is narrowly tailored to serve Minnesota's compelling interest in impartiality articulated as a lack of bias for or against parties to a case. According to the appellees, endorsements pose a particularly acute danger to impartiality defined in this manner because a public endorsement for a candidate indicates a judicial candidate's bias towards the endorsed party. Thus, argue the appellees, the endorsement clause is a necessary evil to protect from such a display of favoritism towards potential litigants. We disagree.

To be sure, the endorsement clause appears more narrowly tailored to serve the state's interest in preserving a bench of judges who are unbiased towards parties than was the announce clause at issue in White I. In particular, in White I the Court noted that the announce clause was not directed to restrict "speech for or against particular *parties*, but rather speech for or against particular *issues*." 536 U.S. at 776. The endorsement clause, on the other hand, appears aimed at restricting speech for or against particular *parties*. But, "[t]he question under our strict scrutiny test . . . is not whether the [endorsement] clause serves this interest *at all*, but whether it is *narrowly tailored* to serve this interest." Id. at 777 n.7. The endorsement clause fails this analysis.

The endorsement clause is overinclusive to meet this end, restricting more speech than is necessary to prevent a public display of favoritism. Although endorsements do indicate a particular connection between endorser and endorsee, a candidate may also use an endorsement as a proxy for expressing his or her views. Indeed, in some instances, endorsing a well-known candidate is a highly effective and efficient means of expressing one's own views on issues. For example, in 1984, much of the country was aware of Ronald Reagan's platform in his bid to serve a second term as President. A judicial candidate who agreed with President Reagan's well-established views on, for instance, a strict interpretation of the Constitution or the need for judicial restraint, might have better and more effectively publicized his own

subjective views by endorsing Mr. Reagan's candidacy, even though it was for a non-judicial office. The same would likely have been true if it had involved President Bill Clinton's campaign for re-election in 1996. Thus, whether it may be wise or necessary for one candidate to endorse another, from one simple statement the judicial candidate can announce his or her own views on a myriad of matters. And, it is highly unlikely that any such similar endorsee would become a party in a state judge's court. Therefore, though the endorsement clause is *aimed* more narrowly at restricting speech dealing with potential *parties*, its reach tends to prevent candidates from expressing views on *issues* as well.

The district court agreed that "endorsement of a particular candidate might serve as a proxy for a position on an issue" but distinguished the clause from our partisan-activities clause analysis in White II by concluding that such a "connection lacks the force and immediacy society applies to the political organization–political issue link." Wersal v. Sexton, 607 F. Supp. 2d 1012, 1022-23 (D. Minn. 2009). We think this analysis is flawed. As we noted in White II, engaging in partisan activities served to link a judicial candidate to the views espoused by the political party with which he aligns. White II, 416 F.3d at 754-55. In some respects, the association with another candidate is stronger indicia of the beliefs of the endorser than is an association with a political party. Particularly, a statement that one is a "Republican" or a "Democrat" or an "Independent" might tip the electorate off as to the type of policies that the candidate would support or reject. But, endorsing a well-established candidate denotes a particular subset of issues and policies with which the endorsing candidate may subscribe. Accordingly, we ascribe the same, if not greater, "force and immediacy" to the link between endorser and endorsee as we do between a candidate and a political party. Thus, the endorsement clause clearly restricts more speech than is necessary to serve an interest in impartiality articulated as a lack of bias for or against parties to a proceeding.

The overinclusiveness of the endorsement clause is further illustrated by the appellees' suggestion that the endorsement of certain candidates poses an acute risk

of a showing of bias for or against particular litigants. Specifically, the appellees are troubled by the notion that a judicial candidate could endorse candidates for sheriff and county attorney–persons who are likely to repeatedly appear as litigants or representatives of litigants in Minnesota courts. We understand this concern. But, the clause is not so cabined. It prohibits endorsements regardless of the likelihood that the endorsee will ever appear as a party in the state's courts. Indeed, the clause prohibits a judicial candidate from endorsing numerous candidates who are unlikely to ever personally appear as parties in Minnesota litigation, for instance the President of the United States or any Governor, Congressman or Senator from a state other than Minnesota. Given that the state's compelling interest in preserving a lack of bias extends only to preventing bias for or against a *party to a proceeding*, White I, 536 U.S. at 775, the endorsement clause easily restricts more speech than necessary to serve that asserted interest.

The endorsement clause is also underinclusive in purporting to serve the compelling interest of electing unbiased judges. In particular, the clause only prevents a candidate from endorsing other *candidates* for public office. Thus, a judicial candidate may endorse a public official or a potential candidate for office so long as the endorsee has not yet officially filed for office. Moreover, the endorsement clause would permit a candidate to endorse the acts and policies of non-candidates no matter the likelihood of their becoming litigants in a case before the court–that is businesses, labor unions, the ACLU or any public officials not running for office. Thus, the clause's underinclusiveness belies its purported purpose of preserving impartiality defined as a lack of bias for parties.

Finally, a categorical ban on endorsements is not the least restrictive nor the most effective means of limiting party bias or its appearance. Instead, where a person who received the judge's endorsement appears before that judge, "recusal is the least restrictive means of accomplishing the state's interest in impartiality articulated as a lack of bias for or against parties to the case." White II, 416 F.3d at 755. In fact, "[t]hrough recusal, the same concerns of bias or the appearance of bias that Minnesota

-21-

seeks to alleviate through the [endorsement] clause are thoroughly addressed without 'burn[ing] the house to roast the pig.'" Id. (third alternation in original) (quoting Butler v. Michigan, 352 U.S. 380, 383 (1957)). Indeed, that Canon 2 requires a judge to recuse "himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned," is evidence of that fact. 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 2.11(A). And, "[c]oncern about the mere *appearance* of bias is also addressed by recusal." White II, 416 F.3d at 755 (second alteration in original). This is because in Minnesota, "[t]he controlling [recusal] principle is that no judge . . . ought ever to [hear] the cause of any citizen, *even though he be entirely free from bias in fact*, if circumstances have arisen which give a bona fide appearance of bias to litigants." In re Collection of Delinquent Real Prop. Taxes, 530 N.W.2d 200, 206 (Minn. 1995) (emphasis in original).

The appellees contend that recusal is not the most effective means to address the bias allegedly created by endorsements. They fear that if the state required a judge to recuse from all cases where a party to the litigation was previously endorsed by that judge, they would be forced to recuse themselves from a great number of cases, or at least from a great number of important cases. We disagree.

First, even if a judge felt compelled to recuse himself from those cases in which he had previously endorsed a party to a lawsuit, it would seemingly be an ineffective campaign strategy for a judicial candidate to endorse persons almost certain to be future litigants. That is to say, to the extent the state is concerned about a judge endorsing the local sheriff and then having to recuse from all cases in which the sheriff is involved (whether as a party or material witness), it would be foolish as a matter of campaign strategy for a judicial candidate to follow such a course of action. It is almost certain that the electorate, especially if notified by a campaign opponent, would reject this tactic. Thus, we believe the electoral marketplace will adequately guard against the "parade of horribles" the appellees advance.

-22-

Second, and perhaps most importantly, contrary to the appellees' views, Caperton v. A.T. Massey Coal Co., 129 S. Ct. 2252 (2009), is not inapposite. In Caperton, while a case was pending before the Supreme Court of Appeals of West Virginia, the CEO of an appealing corporation spent over $3 million supporting Brent Benjamin's campaign for a seat on the court of appeals. Id. at 2257. Once Benjamin won the seat, the appellee requested that Benjamin recuse himself. Benjamin refused. Id.

In the present case, the appellees contend that Benjamin's refusal to recuse in the face of enormous financial contributions evidences that recusal is an ineffective means of addressing potential bias. However, this argument ignores the fact that the Court remedied the due process harm in Caperton by requiring recusal. Id. at 2263-65. And, as the Supreme Court has recently noted "Caperton's holding was limited to the rule that the judge must be recused, not that the litigant's political speech could be banned." Citizen's United, 130 S. Ct. at 910. The harm in Caperton was that the judge refused to recuse himself, not that he originally accepted the $3 million in contributions. Accordingly, Caperton's holding does not require that a judge refuse to speak during his or her campaign, only that due process demands that certain actions which occur during a judicial campaign may later require recusal. And, to the extent a judge remains reluctant to recuse from cases post-Caperton, Minnesota "remain[s] free to impose more rigorous standards for judicial disqualification" than due process requires. Caperton, 129 S. Ct. at 2267 (quotation omitted).

Accordingly, the endorsement clause is not narrowly tailored to serve any interest in electing unbiased judges and it is clearly not the least restrictive means of doing so. Thus, the clause fails strict scrutiny.

b.    Openmindedness

To the extent that openmindedness constitutes a compelling state interest, the endorsement clause is woefully underinclusive. As with the announce clause in White

I and the partisan-activities clause in <u>White II</u>, the endorsement clause was not adopted for the purpose of preserving the openness of a judge to differing legal arguments. See <u>White I</u>, 536 U.S. at 778; <u>White II</u>, 416 F.3d at 756. And, we do not believe that a judicial candidate's endorsement of another candidate indicates that as a judge he or she will be any less open to alternate legal conceptions of a case. Moreover, while the endorsement clause may be an indicator of views on issues, "an affirmative enunciation of views during an election campaign more directly communicates a candidate's beliefs." <u>White II</u>, 416 F.3d at 758. "If, as the Supreme Court has declared, a candidate may *speak* about her views on disputed issues, what appearance of 'impartiality' is protected by keeping a candidate from simply *associating* with a party that espouses the same or similar positions on the subjects about which she has spoken?" <u>Id.</u> Finally, if, as this court has determined, a candidate may associate with a political party without affecting the judge's openness to legal views, then what actual or apparent impartiality is protected by keeping the candidate from associating with one or more individuals on the basis of their stated views? Given this "woeful underinclusiveness" of the endorsement clause, "it is apparent that advancing judicial open-mindedness is not the purpose that 'lies behind the prohibition at issue here.'" <u>Id.</u> (quoting <u>White I</u>, 536 U.S. at 779).

### c.    Other Purported Interests

The appellees contend that the endorsement clause is narrowly tailored to two other interests not addressed in either of the previous <u>White</u> decisions. The first such interest is the matter of preventing a judicial candidate from "abusing the prestige of office." To the extent that this interest is compelling, the endorsement clause is not narrowly tailored to address such an interest because it prevents both judicial candidates who are currently judges–those who could abuse the office–and candidates who are not currently judges–persons who cannot abuse any office because they currently hold no office–from making endorsements. Accordingly, the clause is overinclusive in meeting such an interest and fails strict scrutiny.

-24-

The second interest proffered by the appellees is an interest in "protecting the political independence of the judiciary."[13] The very fact that Minnesota has chosen to elects its judges is indicative of its desire to promote an electorally accountable judiciary. Accordingly, Minnesota, by its current system, has itself created a politically motivated judiciary, bedeviling any claim it has in removing politics from the process. Moreover, how an interest in "protecting the political independence of the judiciary" is any different from an interest in preserving impartiality eludes us. See White I, 536 U.S. at 775 n.6 (collapsing a purported interest in an "independent judiciary" with an interest in impartiality). Thus, if impartiality cannot save the clauses, neither can an interest in "protecting the political independence of the judiciary."

---

[13]Relying on a notion of separation of powers, the White II dissent crafted a similar independence interest noting that "[t]he separation of powers interest is a concern for institutional independence that is distinct from concern for impartiality in any of the senses identified by [White I]." White II, 416 F.3d at 773 (Gibson, J., dissenting). The White II court, however, rejected such a "separation of powers" interest as a compelling interest. Id. at 752 n.7. In particular, we noted two reasons why judicial independence is not a compelling interest: (1) no other court "has ever determined that a state's interest in maintaining a separation of powers is sufficiently compelling to abridge core First Amendment freedoms;" and (2) "nothing in our opinion . . . serve[d] to further blur any existing lines between the judicial, legislative and executive branches of Minnesota state government." Id. Today, appellees continue to rely on the separation of powers to support the endorsement clause, yet they only cite one unreported district court case in which such an interest was even discussed: Carey v. Wolnitzek, No. 3:06-36-KKC, 2008 WL 4602786, at *9 n.10 (E.D. Ky. Oct. 15, 2008), aff'd in part, vacated in part, Nos. 08-6468/6538, 2010 WL 2771866 (6th Cir. July 13, 2010). However, undermining their assertions is the fact that the Wolnitzek court itself refused to identify a separate interest in judicial independence, noting that any such interest was "subsumed within the compelling state interests in prohibiting judicial bias against parties and preserving judicial open-mindedness." Id. Thus, we still find no court which finds the interest in maintaining a separation of powers sufficient to abridge core First Amendment expression. And, just as was the case in White II, nothing in our opinion today serves to blur the lines between the three branches of government.

## 2.    Personal Solicitation Clause

The personal solicitation clause of Canon 4.1 provides, in relevant part, that a judicial candidate shall not "personally solicit or accept campaign contributions other than as authorized by Rules 4.2 and 4.4." 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(6). Canons 4.2 and 4.4 permit a candidate to solicit contributions under certain circumstances. First, the candidate's campaign committee may solicit funds on behalf of the candidate but may not disclose to the candidate the names of contributors. Id. at Canon 4.2(B)(1) & 4.4(B)(3). Second, in response to White II, Canon 4.2(B)(3) permits a candidate to

(a)    make a general request for campaign contributions when speaking to an audience of 20 or more people;

(b)    sign letters, for distribution by the candidate's campaign committee, soliciting campaign contributions, if the letters direct contributions to be sent to the address of the candidate's campaign committee and not that of the candidate; and

(c)    personally solicit campaign contributions from members of the judge's family, from a person with whom the judge has an intimate relationship, or from judges over whom the judge does not exercise supervisory or appellate authority.

Id. at Canon 4.2(B)(3). As stated previously, we review the validity of these clauses only as-applied to Wersal's desire to solicit contributions from non-attorneys.

In White II, we held the solicitation clause subject to strict scrutiny because (1) it restricted speech based wholly upon the subject matter of the speech and (2) it restricted the amount of funds a judicial candidate is able to raise, burdening political speech. 416 F.3d at 763-64. Although Minnesota has amended the solicitation clause in an effort to more narrowly tailor it to the state's interest in preserving judicial impartiality, the clause still serves as a content-based restriction which burdens core

-26-

political speech. Under strict scrutiny, the appellees must prove that applying the personal solicitation clause to Wersal's efforts to solicit from non-attorneys furthers a compelling interest and is narrowly tailored to achieve that interest. See FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 464 (2007).

### a.     Unbiased Judges

"Keeping candidates, who may be elected judges, from directly soliciting money from individuals who may come before them certainly addresses a compelling state interest in impartiality as to parties to a particular case." Id. at 416 F.3d at 765. Moreover, the solicitation of funds may in fact create the appearance of impropriety in terms of the appearance of a *quid pro quo*. And, pursuant to Caperton, "there is a serious risk of actual bias . . . when a person with a personal stake in a particular case ha[s] a significant and disproportionate influence in placing the judge on the case by raising funds [for the judge's campaign] . . . when the case was pending or imminent." 129 S. Ct. at 2263-64. Accordingly, when judicial candidates fundraise, there is a risk that the candidate will be biased towards contributors and against non-contributors. Such a risk, however, inheres in the very practice of judicial elections. See White I, 536 U.S. at 789-90 (O'Connor, J., concurring) ("[T]he cost of campaigning requires judicial candidates to engage in fundraising. Yet relying on campaign donations may leave judges feeling indebted to certain parties or interest groups."). In other words, as long as Minnesota chooses to elect its judges using a system of private financing, it will be faced with the concern that contributions may impair at least the appearance of a judge's impartiality.

We note that the personal solicitation clause, as amended, is certainly *more* narrowly tailored to an interest in impartiality than was its predecessor. Yet, "[i]t seems unlikely . . . that a judicial candidate, if elected, would be a 'judge [who] has a direct, personal, substantial, pecuniary interest in reaching a conclusion [for or] against [a litigant in a case],'" based on whether the judicial candidate had solicited that litigant for a contribution. White II, 416 F.3d at 765 (third, fourth and fifth

alterations in original) (quoting Tumey v. Ohio, 273 U.S. 510, 523 (1927)). This is because such a risk comes not in the mere solicitation–the "ask"–but rather in the resulting contribution. As we noted in White II, the real due process harm comes not from the fundraising itself, but rather from a judicial candidate being able to trace contributions back to individual donors. White II, 416 F.3d at 765; see also Weaver v. Bonner, 309 F.3d 1312, 1323 (11th Cir. 2002) ("Successful candidates will feel beholden to the people who helped them get elected regardless of who did the soliciting of support."). Accordingly, restricting a candidate from personally soliciting funds does not address the state's interest in a non-biased judiciary. Indeed, the personal solicitation clause is underinclusive in addressing such an interest because the Canon permits the candidate's agent–the committee–to solicit funds, but prohibits the candidate from personally soliciting the same funds. Since the identity of the solicitor is irrelevant to the candidate's ultimate bias toward a party, Minnesota's rules on personal solicitation are not narrowly tailored to serve this interest. See Weaver, 309 F.3d at 1322-23 (noting that the risk that a judge "will be tempted to rule a particular way because of contributions . . . is not significantly reduced by allowing the candidate's agent to seek these contributions . . . on the candidate's behalf rather than the candidate seeking them himself").

Minnesota has already provided a less restrictive alternative to prevent the candidate from tracing funds. Specifically, Canon 4 provides that a judicial candidate shall "take reasonable measures to ensure that the candidate will not obtain any information identifying those who contribute or refuse to contribute to the candidate's campaign." 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.2(A)(5). Canon 4 also specifically provides that a candidate may not "personally . . . accept campaign contributions," id. at Canon 4.1(A)(6), and prohibits the campaign committee from disclosing the identity of contributors to the candidate, id. at Canon 4.4(B)(3). And, Wersal does not challenge these requirements and prohibitions. We believe that a candidate could be allowed to make one-on-one solicitations without learning the identity of contributors. This would effectively insulate the candidate from bias-producing knowledge and would be a less restrictive alternative than a total ban on all

face-to-face fund requests. Accordingly, the solicitation clause's categorical ban on solicitations is not narrowly tailored to serve the end of unbiased judges.

Nonetheless, the appellees maintain that soliciting door-to-door poses an acute risk because through such on-the-spot canvassing, a judicial candidate will be able to tell whether an individual is likely to contribute or not. We think not. While it may be possible that a judicial candidate through direct contact may be able to tell whether a person is likely to contribute or not, Canon 4 requires that the candidate take reasonable measures to ensure that the candidate will not learn whether the person actually contributed. In any event, we think it highly unlikely that after such a fleeting encounter, a candidate will remember which solicited person indicated a likelihood of contributing to the campaign or indicated a refusal to do so.

Finally, to the extent that Minnesota is rightly concerned with personal solicitations and campaign contributions that affect the public's confidence in an unbiased judiciary, the least restrictive means of preventing such harm is recusal under the standards of Canon 2.11 should the judge become aware of receipt of a litigant's campaign contribution (or of his or her refusal to do so). Indeed, Wersal represents that he would recuse himself from any proceeding in which a contributor is a party. As with the endorsement clause, recusal serves both to protect a litigant's due process rights and a candidate's right of speech through receipt of campaign contributions. Since "it is our law and our tradition that more speech, not less, is the governing rule," Citizens United, 130 S. Ct. at 911, we think the Constitution favors stricter recusal standards and fewer speech restrictions. Moreover, just as in Citizens United, the personal solicitation clause is a "categorical ban[] on speech that [is] asymmetrical to preventing *quid pro quo* corruption." Id. Accordingly, the application of the solicitation clause to Wersal's desire to solicit from non-attorneys simply is not narrowly tailored to address Minnesota's interest in impartiality defined as a lack of bias for or against parties to a proceeding.

**b. Openmindedness**

We next address whether allowing a judicial candidate to personally solicit face-to-face or to groups of smaller than twenty people would "in some way damage that judge's 'willing[ness] to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case.'" White II, 416 F.3d at 766 (alteration in original) (quoting White I, 536 U.S. at 778). Since the provisions in Canon 4 prohibit the judge from knowing the identity of contributors or being able to trace funds back to contributors, we find that it stretches credulity to believe that solicitations will in some way affect a judge's willingness to consider differing legal views. Accordingly, applying the personal solicitation clause to solicitations addressed to non-attorneys is barely tailored, if at all, to affect the openmindedness of a judge, and fails strict scrutiny.

**3.     Solicitation for a Political Organization or Candidate Clause**

The solicitation for a political organization or candidate clause provides, in relevant part, that a judge or candidate shall not "solicit funds for a political organization or a candidate for public office." 52 Minn. Stat. Ann., Code of Judicial Conduct, Canon 4.1(A)(4)(a). As we noted in the ripeness discussion above, Wersal's challenge to this provision is only ripe to the extent that the clause restricts him from soliciting money from non-attorneys for his own candidacy. Accordingly, we review this clause only to that extent. Because we have already addressed the fact that restricting a candidate from soliciting contributions from non-attorneys for his or her own campaign does not meet the strictures of strict scrutiny, we simply incorporate our earlier analysis here. And, we hold that the solicitation for a political organization or candidate clause, to the extent it prohibits Wersal from soliciting funds for his own campaign from non-attorneys, fails strict scrutiny review.

## III. CONCLUSION

In <u>White I</u>, the Supreme Court struck down the announce clause as violating a judicial candidate's free speech rights. Similarly, in <u>White II</u>, we held that the partisan-activities and solicitation clauses did not survive strict scrutiny and thus violated the First Amendment. Today, after once again considering Minnesota's Code of Conduct, we find that the endorsement, personal solicitation, and solicitation for a political organization clauses similarly fail strict scrutiny. We therefore reverse the district court, and remand with instructions to enter summary judgment for the appellant.

BYE, Circuit Judge, dissenting.

I respectfully dissent. The Court today invalidates provisions of the Minnesota Code of Judicial Conduct prohibiting judicial candidates, including sitting judges, from publicly endorsing other candidates for public office and personally soliciting campaign contributions. Broadly speaking, the Court makes two fundamental errors in its analysis. First, the majority consistently undervalues Minnesota's compelling interest in promoting impartiality and the appearance of impartiality in the Minnesota judicial system. Second, the majority misapprehends the extent to which the provisions of the Code of Judicial Conduct at issue today are both necessary and narrowly tailored to Minnesota's critical interests. In striking down Minnesota's judicial endorsement and solicitation restrictions, the Court today has unnecessarily weakened our courts–and ultimately, I fear, weakened our democracy.

I

As a preliminary matter, I disagree with the majority's conclusion that appellant Gregory Wersal's challenge to Rule 4.1(A)(4) of the Minnesota Code of Judicial Conduct (Code) is ripe for disposition. "Ripeness is demonstrated by a showing that a live controversy exists such that the plaintiffs will sustain immediate injury from the

operation of the challenged [action], and that the injury would be redressed by the relief requested." Employers Ass'n, Inc. v. United Steelworkers, 32 F.3d 1297, 1299 (8th Cir. 1994).

At the district court, Wersal argued Rule 4.1(A)(4), which, in part, bars a judicial candidate from "solicit[ing] funds for a political organization or a candidate for public office," prevented him from soliciting funds for his own campaign, because his own campaign is a "political organization" within the meaning of the rule. The district court held that by reading Rule 4.1(A)(4) in context with the surrounding rules, nothing in Rule 4.1(A)(4) prevented Wersal from soliciting funds (as allowed by the remaining rules) for his own campaign committee. Wersal v. Sexton, 607 F.Supp.2d 1012, 1018 (D. Minn. 2009).

After the district court ruled, but before we heard this appeal, the Minnesota Supreme Court amended the Code to state that "[f]or purposes of this Code, the term [political organization] does not include a judicial candidate's campaign committee created as authorized by Rule 4.4." See Code Terminology Section. Thus, without a colorable argument that his campaign committee qualifies as a political organization, Wersal modified his argument on appeal; Wersal now argues that Rule 4.1(A)(4)'s ban on solicitation for "a candidate for public office" operates to prevent him from soliciting funds for his own campaign. I agree with the majority that Wersal is a candidate for public office under the plain meaning of the phrase, but this point should not end our analysis. While Wersal himself is a candidate for public office, his campaign committee is surely not. As illustrated by Rule 4.4, the campaign committee is an entity separate and distinct from the judicial candidate himself, often serving as a buffer between the judicial candidate and some of the day-to-day campaign activities. For example, Rule 4.4(B)(3) states that "[a] judicial candidate . . . shall direct his or her campaign committee . . . not to disclose to the candidate the identity of campaign contributors . . . ."

To be sure, if Wersal were seeking to solicit contributions and operate his campaign without a campaign committee, then we would have no choice but to confront the constitutionality of Rule 4.1(A)(4). But, as the majority acknowledges, Wersal does not challenge the provisions of the Code involving the use of a campaign committee. Therefore, I would conclude that Wersal's challenge to Rule 4.1(A)(4) is not ripe. Nothing in the Rule–neither the ban on soliciting funds for "a political organization" nor the ban on soliciting funds for "a candidate for public office"–operates to prevent Wersal from soliciting funds for his campaign committee, which is all Wersal seeks to do. By reaching out to partially invalidate Rule 4.1(A)(4), the majority today unnecessarily strikes down a provision of the Code which is simply not implicated in this case. Cf. Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."). Because Wersal's challenge to Rule 4.1(A)(4) is not ripe, I would leave review of Rule 4.1(A)(4) for another day.

II

Although Wersal's challenge to Rule 4.1(A)(4) is not ripe, the constitutionality of the endorsement clause (Rule 4.1(A)(3)) and the solicitation clause (Rule 4.1(A)(6), 4.2(B)(3)(a)) is squarely before this Court. We review de novo a district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. Dunning v. Bush, 536 F.3d 879, 885 (8th Cir. 2008).

A

Because I am in basic agreement with the majority's identification of the governing constitutional framework, I will not repeat it at length here. In brief, Wersal argues the prohibitions Minnesota has placed on judicial candidates, barring

-33-

them from endorsing other candidates for public office and from personally soliciting campaign contributions, violate the First Amendment to the United States Constitution. The First Amendment, made applicable to the states, see McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 336 n. 1 (1995), provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. Because the Code's prohibitions on endorsement and solicitation restrict speech by reference to the content of the targeted speech, we must examine the challenged provisions using an analytical framework commonly known as strict scrutiny. Republican Party of Minn. v. White, 536 U.S. 765, 774-75 (2002) (White I). Under the strict scrutiny analysis, the state bears the burden of proving that the challenged provisions are (1) narrowly tailored, to serve (2) a compelling state interest. Id.

B

Like the majority, I begin my analysis with an examination of the interests served by Minnesota's Code of Judicial Conduct.

Minnesota[14] asserts several interests which it argues are compelling: (1) maintaining judicial impartiality, defined as the lack of bias for or against either party to a proceeding; (2) maintaining the appearance of judicial impartiality; (3) promoting open-mindedness, defined as a willingness to consider views that oppose preconceptions, and remain open to persuasion; (4) preventing candidates from abusing the prestige of office; and (5) protecting the political independence of the judiciary.

---

[14]Wersal sued every member of the Minnesota Board of Judicial Standards and Minnesota Lawyers Professional Responsibility Board in his or her official capacity. For ease of reading, I will refer to the defendants–appellees here–in this case as "Minnesota."

As we observed in Republican Party of Minnesota v. White, 416 F.3d 738, 749 (8th Cir. 2005) (en banc) (White II), precisely what constitutes a "compelling interest" is not easily defined. The Supreme Court has alternatively described the concept as an: "interest[] of the highest order," "overriding state interest," "unusually important interest." Wisconsin v. Yoder, 406 U.S. 205, 215 (1972); McIntyre, 514 U.S. at 347; Goldman v. Weinberger, 475 U.S. 503, 530 (1986) (O'Connor, J., dissenting). Some cases have found an interest compelling based on policy grounds. For example, courts have recognized compelling interests in apprehending highly mobile criminal suspects, deterring murder, avoiding the harms of illicit drugs, realizing consumer benefits in licensing requirements for professionals, and upholding the administration of justice. See Stephen E. Gottlieb, Compelling Governmental Interests: An Essential But Unanalyzed Term in Constitutional Adjudication, 68 B.U. L.Rev. 917, 935 n. 85 (1988) (collecting cases). Other examples of compelling government interests recognized by the Supreme Court include "[p]ressing public necessity" during wartime, see Korematsu v. United States, 323 U.S. 214, 216 (1944), combating terrorism, see Holder v. Humanitarian Law Project, --- S.Ct. ----, 2010 WL 2471055, at *23 (June 21, 2010), the need to remedy specific instances of past discrimination, see Wygant v. Jackson Bd. of Ed., 476 U.S. 267, 277 (1986), attaining "student body diversity" in higher education, see Grutter v. Bollinger, 539 U.S. 306, 325 (2003), and maintaining "prison security and discipline," see Johnson v. California, 543 U.S. 499, 512 (2005). Other cases have found a basis for recognizing a compelling interest in "the realization of constitutional guarantees." White II, 416 F. 3d at 750 (citations omitted).

There is broad agreement that states have a compelling interest in employing judges who are actually impartial. Indeed, due process requires that judges be impartial. See, e.g., Tumey v. Ohio, 273 U.S. 510, 512 (1927). Actual impartiality means a judge's lack of bias for or against either party to a proceeding. White I, 536 U.S. at 775.

With respect to Minnesota's asserted interest in promoting the *appearance* of impartiality, we have thus far provided little–too little–examination of the subject. During oral argument in this case, I asked Wersal's counsel whether the state of Minnesota has "a compelling interest here in maintaining the appearance of impartiality set apart from the state's interest in promoting actual impartiality?" Counsel responded, "Yes, I think they have both." Notwithstanding the parties' agreement on the subject, I want to take a moment to explore the meaning and potential importance of Minnesota's interest in promoting the appearance of impartiality in the state's judiciary.

Drawing from the "core" definition of impartiality recognized in White I, the appearance of impartiality, as the phrase is used in this dissent, means the perception of a judiciary made up of judges who lack bias for or against a particular party (or parties) to a given proceeding. To be sure, the concepts of actual and perceived impartiality are related, but they are not entirely coextensive. For example, a hypothetical judge who harbors a bias towards Catholics but shows no outward manifestations of her bias lacks impartiality (at least in a case where one party is Catholic), but may not create the appearance of impartiality. Likewise, a judge who uses disrespectful language when addressing criminal defendants will likely be perceived as lacking impartiality, even if the judge lacks an actual bias against any particular party. Cf. Inquiry into Conduct of Blakely, 772 N.W.2d 516, 523-26 (Minn. 2009) (per curiam) (discussing the difference between actual and perceived impropriety by a judge, and the appropriate sanction for each necessary "to protect the public by preserving the integrity of the judicial system"); Buckley v. Valeo, 424 U.S. 1, 26-27 (1976) (discussing the differences between actual and perceived corruption in our political system). Two features serve to distinguish the concepts of actual impartiality and the appearance of impartiality. First, while the existence of actual impartiality turns on a particular judge's mental state, the appearance of impartiality springs from the perceptions of people who see, hear, read about, or otherwise interact with one or more judges in the judicial system. Second, while an examination of actual impartiality will use a narrow lens, usually focusing on an individual

-36-

assessment of one particular judge, an inquiry into the appearance of impartiality will often focus on the aggregate: how the judiciary is perceived by the people it serves.[15]

Turning to the relative importance of maintaining the appearance of impartiality, several sources help illuminate the compelling nature of Minnesota's interest in fostering the appearance of impartiality. There is no question that maintaining the appearance of impartiality is a central pillar to the Minnesota Code of Judicial Conduct, reflecting the Minnesota Supreme Court's empirical judgment on the relative importance of maintaining the appearance of impartiality in the state judiciary. The Code states that "[i]nherent in all the Rules contained in this Code are the precepts that judges, individually and collectively, must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system." Code Preamble. In addition, judges are admonished to "avoid both impropriety and the appearance of impropriety" and "aspire at all times to conduct that ensures the greatest possible public confidence in their independence, impartiality, integrity, and competence." Id. The Constitution itself points in the same direction. Our law dictates that a mere appearance of bias, without a showing of actual bias, is sufficient in some circumstances to violate the due process rights of litigants. See Caperton v. A.T. Massey Coal Co., Inc., 129 S. Ct. 2252, 2257 (2009) (holding that a party's due process rights are violated when "the probability of actual bias on the part of the judge or decisionmaker is too high."). Finally, relevant historical sources evince a long-held view on the importance of maintaining the appearance of impartiality in the judiciary. Writing in support of ratifying the newly-written United States Constitution, Alexander Hamilton wrote:

[15]In this sense, the interest in maintaining the appearance of judicial impartiality is a close cousin to the "weighty interest[]" in preventing the "appearance of corruption," which the Supreme Court described in Buckley as "stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." Buckley, 424 U.S. at 27, 29.

The benefits of the integrity and moderation of the judiciary have already been felt in more States than one; and though they may have displeased those whose sinister expectations they may have disappointed, they must have commanded the esteem and applause of all the virtuous and disinterested. Considerate men, of every description, ought to prize whatever will tend to beget or fortify that temper in the courts: as no man can be sure that he may not be to-morrow the victim of a spirit of injustice, by which he may be a gainer to-day. And every man must now feel, that the inevitable tendency of such a spirit is to sap the foundations of public and private confidence, and to introduce in its stead universal distrust and distress.

The Federalist No. 78 (Alexander Hamilton).

The "universal distrust and distress" Hamilton described can take hold in an atmosphere where the public has lost confidence–rightfully or not–in the impartiality of its judiciary. A perception of systemic bias can cause a chilling effect on the exercise of legal rights: parties or potential parties "may be reluctant to expend time and resources in a judicial system perceptibly stacked against them on account of who they are." Tobin A. Sparling, Keeping Up Appearances: the Constitutionality of the Model Code of Judicial Conduct's Prohibition of Extrajudicial Speech Creating the Appearance of Bias, 19 Geo. J. Legal Ethics 441, 472 (2006). More broadly, it is not an overstatement to say that public confidence in the judiciary is necessary to a functioning democracy and civil society. One need not look very far beyond our borders to see the consequences where judiciaries–rightfully or not–have lost their reputation for delivering justice. Judicial institutions are replaced by less refined methods of problem solving. Gangs, warlords, militias, and vigilante justice can easily become de facto judges and juries.

For the foregoing reasons, I would conclude, independent of the parties' agreement, that Minnesota has met its burden of demonstrating a compelling state interest in (1) maintaining actual judicial impartiality and (2) maintaining the

appearance of judicial impartiality.[16] Cf. Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 290 (1917) ("[T]he court cannot be controlled by agreement of counsel on a subsidiary question of law.").

The mere identification of Minnesota's compelling state interests, however, does not, standing alone, justify the provisions of the Code Wersal challenges. Where a state seeks to protect its interests through content-based speech restrictions, as Minnesota does here, courts must engage in an exacting review, examining the extent to which the challenged provisions are "narrowly tailored" to the identified interests. White I, 536 U.S. at 774-75. It is to that review I now turn.

C

As we stated in White II, "whether or not a regulation is narrowly tailored is evidenced by factors of relatedness between the regulation and the stated governmental interest." 416 F. 3d at 751.

> A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative).

Id.

---

[16]Because I ultimately conclude that the provisions of the Code challenged in this litigation are narrowly tailored to these two interests, I need not confront today whether the remaining interests proffered by Minnesota are compelling.

I turn first to the endorsement clause. Rule 4.1(A)(3) provides that a judge or judicial candidate shall not "publicly endorse or, except for the judge or candidate's opponent, publicly oppose another candidate for public office."

The endorsement clause advances the state's interest in maintaining actual judicial impartiality and the appearance of impartiality. When a judge or judicial candidate endorses another candidate, the act of endorsement creates a risk that the judge will not be impartial. There is a risk the judge will harbor a bias in favor of the endorsed candidate and those who associate with or support that candidate. Equally important, there is a risk the judge will harbor a bias *against* other candidates in the same race as the endorsed candidate, and those who associate with or support the candidates who did not receive the endorsement. Even more fundamentally, the act of endorsement directly undercuts the state's interest in maintaining the appearance or impartiality. By moving past the role of mere participant in the political system to the role of political power broker trading on the currency of his position, a judge who gives political endorsements creates the perception of a judicial branch beholden to political interests. Indeed, in a recent survey of Minnesotans, ninety-one percent thought "the courts are supposed to play a unique role in our democratic system and should be free of political pressures;" only five percent believed "the Minnesota State Courts are just like the Executive and Legislative branches of government and should not be free of political pressures." <u>See</u> The Minnesota Difference: The Minnesota Court System and the Public (2007), available at http://www.courts.state.mn.us/documents/0/Public/Court_Information_Office/Minnesota_Courts_Final_Report_FINAL.doc. By placing political pressures on the endorsing judge, the endorsement effectively erodes the appearance of judicial impartiality.

In addition, the endorsement clause does not sweep too broadly. The majority first attempts to analogize the endorsement clause to the much broader announce

clause struck down in <u>White I</u>. But the majority's analysis on this point is seriously flawed. The Supreme Court held that the announce clause, which stated that a candidate for judicial office shall not "announce his or her views on disputed legal or political issues," was not narrowly tailored to the state's interest in maintaining actual impartiality or the appearance of impartiality. <u>White I</u>, 536 U.S. at 770. The Court reasoned that the announce clause "d[id] not restrict speech for or against particular <u>parties</u>, but rather speech for or against particular <u>issues</u>." <u>Id.</u> at 776 (emphasis in original). It seems plain enough that this case presents precisely the opposite scenario: the endorsement clause restricts speech for or against parties, not issues.

The majority attempts to circumvent the clear hurdle presented by <u>White I</u> by positing that the endorsement clause is really just another announce clause in disguise. To illustrate its point, the majority explains that an endorsement of Ronald Reagan for President could convey a judicial candidate's support for strict interpretation of the Constitution. The majority's point that speech can and does serve as a proxy for other, underlying ideas is well taken. But, under the lens of strict scrutiny, our focus must remain on the speech that is regulated by reference to its *content*. <u>See</u> <u>Eu</u>, 489 U. S. at 222. To be sure, the endorsement clause is content-based, because the clause prohibits judicial candidates from expressing the idea of endorsement itself, while leaving unregulated speech on every other subject matter. But the endorsement clause, unlike the announce clause, does not regulate underlying ideas conveyed by the endorsement by reference to their content. With respect to a judicial candidate's views on strict interpretation of the Constitution, or abortion, or same-sex marriage, or any other idea the judicial candidate wishes to convey, the endorsement clause is entirely content-neutral. The candidate is free to state: "I support (or oppose) a strict interpretation of the Constitution." The candidate could even say "I support strict interpretation, as articulated by Ronald Reagan." The only idea the candidate is barred from expressing is the idea of endorsement itself–an idea that does not burden any other ideas or viewpoints on an unequal basis. The announce clause, by contrast, directly regulated a large class of ideas according to their content, forbidding speech on disputed legal or political issues, but leaving unregulated speech on all undisputed

-41-

issues, as well as disputed issues not of a political or legal nature.  See White I, 536 U.S. at 768.

The majority's analysis thus effectively renders pointless the idea/party distinction drawn in White I.  Under the majority's analysis, even a speech restriction on statements showing bias against a party to a proceeding would fail strict scrutiny.  Following the majority's reasoning, such a restriction would also necessarily limit the expression of secondary ideas conveyed by the statement of bias.  For example, the statement "I am biased against plaintiff Smith" could also theoretically convey a judicial candidate's view that the court system is overburdened by frivolous lawsuits.  If, as the majority suggests, we must take account in our strict scrutiny analysis of all possible secondary meanings of the statement of bias–even those not regulated by reference to their content–then even a ban on speech showing bias towards a party would be overinclusive with respect to a state's compelling interest in judicial impartiality.  This is so because the ban on biased statements would impermissibly limit, according to the majority's analysis, the judicial candidate from expressing his views on frivolous lawsuits.  In contrast to the majority's incorrect analytical approach, the Supreme Court has consistently confined its strict scrutiny overinclusiveness analysis to speech regulated by its content by the terms of the speech restriction itself.  For example, in Simon & Schuster, Inc. v. Members of New York State Crime Victims Board, 502 U.S. 105 (1991) the Supreme Court struck down a New York law preventing criminals from profiting by selling books describing their crimes.  Id. at 123.  The Court held the law overinclusive with respect to New York's compelling interest in preventing criminals from profiting from their crimes, as the law would apply to "such works as the Autobiography of Malcolm X," Civil Disobedience by Henry David Thoreau, as well as works by Martin Luther King, Jr.  Id. at 121.  The Court concluded that the law "clearly reaches a wide range of literature that does not enable a criminal to profit from his crime."  Id. at 122.

Our focus, therefore, when asking whether the endorsement clause sweeps too broadly, should not extend beyond the ideas regulated by the endorsement clause

because of their content. With the proper legal standard in mind, I would conclude the endorsement clause does not sweep too broadly. Because, as previously discussed, every endorsement of a person carries the risk of bias, or the appearance of bias, the endorsement clause targets precisely the speech most likely to implicate Minnesota's compelling interests.[17]

Nor is the endorsement clause underinclusive. The endorsement clause must be read in concert with Rule 4.1(A)(10) of the Code, which states that "a judge or judicial candidate shall not . . . make any statement that would reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court . . . ." By its plain terms, Rule 4.1(A)(10) prevents a judge or judicial candidate from making any statement showing bias for or against any party, in either a pending or impending proceeding, as such a statement would "impair the fairness" of the case. Rule 4.1(A)(10), together with the endorsement clause, ensures that no speech directly bearing on a judicial candidate's bias towards a party is left unregulated.

---

[17]The majority finds fault with the endorsement clause for the independent reason that not all persons who receive endorsements will become parties in Minnesota courts. The majority's reasoning misses the mark in three respects. First, any candidate for public office could become a party to a proceeding in Minnesota, and it is impossible to determine beforehand who will appear in court as a party and with what frequency. More importantly, the majority makes the faulty assumption that a judge who makes an endorsement would only potentially be biased in favor of the recipient of the endorsement herself. As previously discussed, such bias could easily extend to the endorsee's supporters and associates, as well as other candidates who did not receive the judicial candidate's endorsement, along with their friends and supporters. Therefore, the risk of actual bias is much greater than the majority lets on, even in cases where the endorsed candidate never appears as a party in court before the judicial candidate. Finally, the majority, as it does throughout its opinion, ignores the extent to which each and every endorsement creates the *appearance* of bias irrespective of whether the endorsed candidate ever appears in court.

-43-

The majority attempts to illustrate the endorsement clause's underinclusiveness by asserting that "a judicial candidate may endorse a public official or a potential candidate for office so long as the endorsee has not yet officially filed for office." Ante at 21. But the majority's assertion is incorrect in two important respects. First, in the vast run of cases, Rule 4.1(A)(10) will prevent a judicial candidate from endorsing a public official. For example, a judicial candidate would be prevented from "endorsing"[18] a lame duck county sheriff or county attorney because doing so would "impair the fairness of a matter pending or impending in any court," as sheriffs and county attorneys continually appear in court. Second, the majority assumes, wrongly, that a potential recipient of an endorsement is not a "candidate for public office" within the meaning of the endorsement clause until she "officially file[s] for office." Ante at 21. In the case of judicial candidates endorsing other judicial candidates, the majority's assertion is demonstrably false:

> A person becomes a candidate for judicial office as soon as he or she makes a public announcement of candidacy, declares or files as a candidate with the election or appointment authority, authorizes or, where permitted, engages in solicitation or acceptance of contributions or support, or is nominated for election or appointment to office.

Code Terminology Section. Although the Code is silent on precisely when a non-judicial candidate becomes a "candidate for public office," I would construe the endorsement clause's "candidate for public office" language consistently with the Code's definition of a candidate for judicial office. In other words, a person becomes a candidate for public office when he (1) makes a public announcement of candidacy, (2) files, (3) authorizes or engages in solicitation, or (4) is nominated for office. Such a construction helps alleviate the underinclusiveness identified by the majority. See Edward J. DeBartolo Corp., 485 U.S. at 575 (avoidance canon of statutory

---

[18]Obviously the concept of endorsement here would mean something different than an endorsement for office, as the public official, by hypothesis, is not a candidate for public office.

interpretation). In the narrow subset of cases where an "endorsement" of a person would not be barred by either the endorsement clause or Rule 4.1(A)(10), the speech is left unregulated precisely because these cases do not implicate Minnesota's interests in promoting impartiality or its appearance. Endorsing persons who are not involved in current or impending litigation before any court and who are not running for public office presents little risk of creating actual bias, and does not raise the same quid pro quo and political independence concerns that would lead a reasonable person to perceive a decreased appearance of judicial impartiality.

The majority also finds the endorsement clause underinclusive because, in the majority's words, "the endorsement clause would permit a candidate to endorse the acts and policies of non-candidates [such as] businesses, labor unions, the ACLU or any public officials not running for office." But the absence of the hypothetical speech restrictions outlined by the majority cannot be evidence of the endorsement clause's underinclusiveness because the speech restrictions described by the majority would be *unconstitutional*. As an illustration, the American Civil Liberties Union lists "free speech" as one of the organization's "key issues," stating that "[s]ince 1920, the ACLU has worked to preserve our freedom of speech." See http://www.aclu.org/key-issues. If Minnesota attempted to prohibit judicial candidates from echoing the ACLU and announcing their views that, for example, they "work to preserve our freedom of speech," it is beyond dispute that the prohibition would violate judicial candidates' First Amendment rights. See White I, 536 U.S. at 770. Indeed, the speech restrictions on "acts and policies of non-candidates" suggested by the majority would be woefully overinclusive according to the majority's own analysis contained just one page earlier in its opinion! I would not require Minnesota to violate the Constitution in order to craft a constitutional endorsement clause.

Finally, I disagree with the majority's conclusion that recusal would adequately address Minnesota's interests in maintaining judicial impartiality and the appearance of judicial impartiality. In White II, we relied, in part, on the availability of recusal

-45-

as a less-restrictive alternative in striking down the prior Code's partisan activities clause and parts of the solicitation clause. White II, 416 F. 3d at 754, 765-66. Implicit in our conclusion in White II was our understanding that recusals would not be so frequent as to seriously disrupt the proper functioning of the judicial system. In contrast to White II, however, recusal is an inadequate remedy in a judicial system where judges and judicial candidates are permitted to endorse each other and other candidates for public office. As the district court observed, recusal is unworkable "when a judge endorses an individual who is elected to a position where he or she is frequently a litigant." Wersal, 607 F. Supp. 2d at 1023. For example, if a district court judge in a rural area endorsed the county sheriff and county attorney for re-election, the judge would be required to recuse himself in almost every criminal case–and few, if any, other judges would be available to take over the case load. Similarly, if an appellate court judge endorsed a slate of district court judges, the appellate court judge would have to recuse himself in every appeal reviewing the judgment of any of the endorsed district court judges. The same is true of a judicial candidate who endorsed prominent political figures in Minnesota, who are frequently parties to judicial proceedings. See, e.g., Coleman v. Franken, 767 N.W.2d 453 (Minn. 2009); Brayton v. Pawlenty, 781 N.W.2d 357 (Minn. 2010).

In short, a system of open endorsements would create a tangled web of conflicts that could not be solved by recusals. Perhaps more fundamentally, even if judges managed to recuse themselves whenever an endorsee was a party (or witness) to a proceeding, the recusals would do little to change the perception that the judiciary as a whole lacks impartiality. Perceptions of bias would be justified in cases involving not just endorsees, but also their friends, family, associates, supporters, opposing candidates, and their supporters. Some citizens might conclude, reasonably, that the judicial system is simply too compromised by partisan politics, and resolve their disputes through alternative means. Although recusals would undoubtably mitigate bias in some instances, they would not–in a climate of pervasive endorsements by judges and judicial candidates–protect Minnesota's interests in maintaining impartiality and the appearance of impartiality at even a tolerable level.

For the forgoing reasons, I would conclude that Minnesota has met its heavy burden in demonstrating that the endorsement clause is narrowly tailored to the state's compelling interests. In so concluding, I would join what was, before today, the unanimous judgment of state and federal courts affirming the constitutionality of judicial endorsement prohibitions. See Siefert v. Alexander, --- F.3d ----, No. 09-1713, 2010 WL 2346659, at *7 (7th Cir. June 14, 2010); In re Matter of William A. Vincent, Jr., 172 P.3d 605, 606, 608-09 (N.M. 2007) (upholding a judicial canon that prohibited a judge or judicial candidate from "publicly endors[ing] or publicly oppos[ing] a candidate for public office through the news media or in campaign literature" finding that the clause was "narrowly tailored to serve the State's compelling interest in a judiciary that is both impartial in fact and in appearance"); In re Matter of Ira J. Raab, 793 N.E.2d 1287, 1292 (N.Y. 2003); Yost v. Stout, No. 06-4122-JAR, slip op. at 12 (D. Kan. Nov. 16, 2008) (upholding endorsement clause because provision "restricts a judge or judicial candidate from publicly endorsing other candidates for public office; it does not restrict speech concerning disputed political issues.").

2

I turn next to the solicitation clause. Rule 4.1(A)(6) of the Code bars judges and judicial candidates from "personally solicit[ing] or accept[ing] campaign contributions other than as authorized by Rules 4.2 and 4.4." Rule 4.2(B)(3)(a) permits a judge or judicial candidate to "make a general request for campaign contributions when speaking to an audience of 20 or more people." In addition, Rule 4.2(B)(3)(c) permits a judge or judicial candidate to "personally solicit campaign contributions from members of the judge's family, from a person with whom the judge has an intimate relationship, or from judges over whom the judge does not exercise supervisory or appellate authority." However, as previously discussed, the Code does not allow what Wersal seeks to do: personally solicit campaign contributions by walking door-to-door and making phone calls.

As a preliminary matter, I disagree with the majority's decision to analyze Wersal's challenge to the Code's solicitation clause as an as-applied, rather than facial, challenge. In White II, we sustained a facial challenge to the solicitation clause (as then written) despite the fact that the challenge was limited to the clause's prohibition on soliciting contributions from large groups and using a candidate's signature on campaign committee literature. White II, 416 F. 3d at 765-66. Further, the majority predicates its decision to analyze the solicitation clause as-applied on the alleged fact that Wersal wishes to solicit funds only from non-attorneys. Ante at 13, 26. Nowhere in the record does Wersal state, or even imply, that he would limit his solicitation entirely to non-attorneys. On the contrary, Wersal states he wishes to "personally solicit contributions from potential donors both by going door-to-door [and] making personal phone calls." Wersal does state that he "does not wish to solicit funds from those he knows to be attorneys," but Wersal would undoubtably encounter persons whom he does not know to be attorneys in the course of his proposed solicitation. Without any suggestion to the contrary from Wersal, it is unreasonable to infer from the facts in the record before us that Wersal only intends to solicit funds from non-attorneys. See Dunning , 536 F.3d at 885 (in reviewing summary judgment orders, appellate court must view the evidence in the light most favorable to the nonmoving party).[19]

Turning to the merits, I would conclude the solicitation clause furthers Minnesota's compelling interest in maintaining the appearance of judicial impartiality. As Justice O'Connor observed in White I, "the mere possibility that judges' decisions may be motivated by the desire to repay campaign contributors is likely to undermine

---

[19]Wersal does state once in his brief that he wishes to personally solicit campaign contributions only from non-attorneys. App. Br. at 55. It is axiomatic, however, that appellate courts will "not take[] into consideration matters included in the [a party's] brief which were not before the trial court and are no[t] part of the record on appeal." Nelson v. Swing-A-Way Mfg. Co., 266 F.2d 184, 189 (8th Cir. 1959).

the public's confidence in the judiciary." White I, 536 U.S. at 790 (O'Connor, J., concurring). Indeed, "there is no aspect of the electoral system of choosing judges that has drawn more vehement and justifiable criticism than the raising of campaign funds, particularly from lawyers and litigants likely to appear before the court." Stretton v. Disciplinary Bd. of Supreme Court of Penn., 944 F.2d 137, 145 (3d Cir. 1991) (footnote omitted) (upholding prohibition on personal solicitation). And as the Oregon Supreme Court observed:

> The stake of the public in a judiciary that is both honest in fact and honest in appearance is profound. . . . A judge's direct request for campaign contributions offers a quid pro quo or, at least, can be perceived by the public to do so. Insulating the judge from such direct solicitation eliminates the appearance (at least) of impropriety and, to that extent, preserves the judiciary's reputation for integrity.

In re Fadeley, 802 P.2d 31, 40 (Or. 1990) (upholding prohibition on personal solicitation of funds).

Whether personal solicitation by judicial candidates impacts the appearance of impartiality is an empirical question. Cf. Holder v. Humanitarian Law Project, --- S.Ct. ----, Nos. 08-1498, 09-89, 2010 WL 2471055, at *19 (June 21, 2010) ("Whether foreign terrorist organizations meaningfully segregate support of their legitimate activities from support of terrorism is an empirical question."). Recent polls found that seventy percent of the public thinks raising money for their elections affects judges' rulings to a moderate or great extent. Kathleen Hall Jamieson and Michael Hennessy, Public Understanding and Support for the Courts: Survey Results, 95 Geo. L.J. 899, 901 (2007). According to a 2002 written survey, forty-eight percent of state supreme court judges believe that campaign contributions to judges have "a great deal" or "some" influence on judges' decisions. Greenberg Quinlan Rosner Research & American Viewpoint, Justice At Stake State Judges Frequency Questionnaire, Q.12 at 5 (2002). Turning the focus to Minnesota, a 2008 poll found that fifty-nine percent of Minnesotans said that contributions have "a great deal"

or "some" influence on judges. Decision Resources Ltd., Justice at Stake Study, Minnesota Statewide, Q. 35 (January 2008). And forty-nine percent of Minnesotans thought that "individuals or groups who give money to judicial candidates in Minnesota get favorable treatment." See The Minnesota Difference: The Minnesota Court System and the Public (2007), available at http://www.courts.state.mn.us/documents/0/Public/Court_Information_Office/Minnesota_Courts_Final_Report_FINAL.doc.

The majority skips past this data and finds the solicitation clause overinclusive because the risk of bias "comes not in the mere solicitation–the 'ask'–but rather in the resulting contribution." Ante at 28. I disagree. At the outset, the majority's statement runs counter to our statement in White II that "[k]eeping candidates, who may be elected judges, from directly soliciting money from individuals who may come before them certainly addresses a compelling state interest in impartiality . . . ." 416 F.3d at 765. Additionally, when a judge or judicial candidate asks for money, one-on-one, the potential donor is presented with an unseemly choice: contribute, and perpetuate the appearance of impartiality, or decline to contribute, and risk retribution. As the Supreme Judicial Court of Maine stated:

> It is exactly this activity that potentially creates a bias, or at least the appearance of bias, for or against a party to a proceeding. If a contribution is made, a judge might subsequently be accused of favoring the contributor in court. If a contribution is declined, a judge might be accused of punishing a contributor in court.

In re Dunleavy, 838 A.2d 338, 351 (Me. 2003). Contrary to the majority's assertion, it is precisely the act of asking for money one-on-one that creates the appearance of impartiality. And no matter what course of action the potential donor chooses, the appearance of judicial impartiality is diminished. As the Seventh Circuit aptly stated, "[a] direct solicitation closely links the quid–avoiding the judge's future disfavor–to the quo–the contribution." Siefert, 2010 WL 2346659, at *30-31.

Such a result inheres in the Supreme Court's decision in <u>McConnell v. Federal Election Commission</u>, 540 U.S. 93 (2003), <u>overruled in part on other grounds</u>, <u>Citizens United v. FEC</u>, 130 S. Ct. 876, 886 (2010). There, the Supreme Court upheld against a First Amendment challenge a provision of the Bipartisan Campaign Reform Act of 2002 prohibiting (with limited exceptions) federal candidates and officeholders from soliciting soft money contributions. <u>Id.</u> at 183-84; <u>id.</u> at 314 (Kennedy, J., concurring). Directly contrary to what the court holds today, the Supreme Court stated that "soft-money donations at a candidate's or officeholder's behest give rise to all of the same corruption concerns posed by contributions made directly to the candidate or officeholder," and "the value of the donation to the candidate or officeholder is *evident from the fact of the solicitation itself*." <u>Id.</u> at 182 (emphasis added). <u>See also</u> <u>Siefert</u>, 2010 WL 2346659, at *31.

I also disagree with the majority's assertion that less restrictive means exist to protect Minnesota's compelling interests. In Minnesota, judicial candidates are required to "take reasonable measures to ensure that the candidate will not obtain any information identifying those who contribute or refuse to contribute to the candidate's campaign." Code Rule 4.2(A)(5). Although the rule banning judicial candidates from learning the identity of donors certainly helps maintain the appearance of impartiality, the efficacy of the rule is greatly undermined without an operative solicitation clause. As anyone familiar with retail politics can attest, potential donors will often interrupt the pitch for money with an answer, or a door in the face. In other cases, verbal cues and body language by the potential donor will leave the judicial candidate with a strong impression of the potential donor's likelihood of making a contribution. Thus, the act of solicitation itself will, in many cases, significantly undermine Minnesota's goal of preventing the judicial candidate from learning the identity of those who contribute or refuse to contribute.

Neither is recusal an adequate alternative to the solicitation clause. The recent <u>Caperton</u> case illustrates why. In <u>Caperton</u>, a West Virginia jury returned a verdict that found the defendants, A.T. Massey Coal Co. and its affiliates, liable for $50

million in damages. <u>Caperton</u>, 129 S. Ct. at 2257 (2009). While the coal company's appeal was pending, Don Blankenship, Massey's chairman and chief executive officer spent over $2.5 million in support of a candidate running against an incumbent for a seat on the Supreme Court of Appeals of West Virginia. <u>Id.</u> The candidate, Brent Benjamin, won the election. <u>Id.</u> Later, when Massey's appeal was heard by the Supreme Court of Appeals of West Virginia, then-Justice Benjamin refused to recuse himself and cast the deciding vote in the court's decision reversing the $50 million verdict. <u>Id.</u> at 2257-58. The United States Supreme Court ultimately held that the Due Process Clause required Justice Benjamin to recuse himself. <u>Id.</u> at 2265. I cite <u>Caperton</u> not for its legal holding, but rather as a cautionary tale illustrating two points. First, judges whose contributions give rise to the appearance of partiality may be reluctant to recuse themselves. Second, and most fundamentally, by the time a case rises to the level of egregiousness where the Due Process Clause, by its own force, *requires* recusal, the judiciary's appearance of impartiality has already been severely undermined. I would not force Minnesota to follow West Virginia's path. The state's interest in maintaining the appearance of impartiality in its judiciary goes far beyond protecting the absolute baseline of fundamental fairness required by due process. Having recognized Minnesota's interest in maintaining the appearance of impartiality as compelling, I would conclude that the solicitation clause is narrowly tailored to serve this interest.

I would conclude, therefore, that the solicitation clause does not violate the First Amendment.[20]

---

[20]Although I concluded that Wersal's challenge to Rule 4.1(A)(4) was not ripe, the majority reached the issue. If required to confront the merits, I would similarly uphold Rule 4.1(A)(4) for the same reasons I would sustain the solicitation clause.

# III

Although not essential to the legal conclusions I reach today, I wish to comment briefly on the development of our caselaw in this area.

Underlying today's decision, as well as our prior decisions, are somewhat competing philosophies with respect to judicial elections. These differences were most evident in White I. In White I's majority opinion, written by Justice Scalia, the Court made clear that judicial elections should be played out under the same rules as any other election for public office. By contrast, Justice Ginsburg, in her dissenting opinion, presented a competing philosophy, which would "differentiate elections for political offices, in which the First Amendment holds full sway, from elections designed to select those whose office it is to administer justice without respect to persons." White I, 536 U.S. at 805 (Ginsburg, J. dissenting). Although White I may not have provided the final word on the larger philosophical debate, it did provide us with the appropriate framework for deciding constitutional challenges arising in the context of judicial elections. Once the Court made the threshold choice to apply the strict scrutiny framework to speech restrictions governing judicial elections, the result in White I was clear: the suppression of views on disputed legal and political issues is, as the Court noted, only tenuously related to any interest in maintaining an impartial judiciary.

White II was this court's first opportunity to apply the strict scrutiny framework announced in White I to a relatively more difficult set of provisions in the Minnesota Code of Judicial Conduct. I joined this court's opinion in White II because I concluded that Minnesota's ban on partisan activities and solicitation from large groups, although perhaps important, were not essential to the state's interests in maintaining judicial impartiality or its appearance.

In parting ways with the court today, I note my increasing discomfort with the court's analytical approach. As I see it, the court's analysis, at the most basic level,

amounts to an examination of whether a given speech restriction placed on judges is essential–in every case–to fully realize the protections of due process. Without prejudicing the outcome of future challenges, no speech restriction, whether it is imposed on judicial candidates or simply judges, is essential to due process in every case. The majority's approach, in my view, significantly discounts the role states play in maintaining a judicial system that serves its people with a higher standard of fairness and impartiality. Although the Constitution guarantees a minimum standard of fundamental fairness, Minnesota has endeavored to hold itself to a higher standard. Implicit in the majority's opinion is the notion that any effort to maintain judicial impartiality or its appearance beyond what the Constitution requires is nonessential and expendable. To be sure, White I counsels us to review restrictions on speech with exacting scrutiny. But where a state has crafted its restrictions carefully to maintain a fair and impartial judiciary, in both practice and appearance, as Minnesota has done here, the First Amendment must yield.

IV

For the foregoing reasons, I respectfully dissent.

_____